Blackburn *v*. White.

4-6139

147 S. W. 2d 7

Opinion delivered January 13, 1941.

*George W. Dodd,* for appellant.

*Pryor & Pryor,* for appellee.

SMITH, J. All the parties to this litigation are colored people except Mrs. Lida B. Archer, and their lack of business knowledge is very obvious. In all the transactions hereinafter referred to they acted without legal advice.

The relationship of the parties to each other is as follows: Louis Bolin is a retired postman, and Louise White and Roy White are his daughter and son-in-law. Edward Blackburn is the son and only heir-at-law of Steve and Sophia Blackburn, both deceased. Armstead Ray, who was an illiterate old man, unable to read or write, married Steve Blackburn's mother, the grandmother of Edward. The grandmother died many years ago, leaving Armstead Ray her widower. After Ray married the widow of Blackburn, he purchased a lot in the city of Fort Smith which is the subject-matter of this litigation.

On October 23, 1928, Ray deeded the property to Steve Blackburn, the father of Edward and the son of Ray's wife. This deed is one of general warranty as to title. Below the description of the property in parentheses is the following notation: "(A part of the consideration mentioned above is that the said Steve Blackburn undertakes and agrees to maintain, keep and support Armstead Ray during the remainder of his life.)" Ray died August 4, 1937. Steve Blackburn died May 5, 1930, and Sophia, his widow, died July 10, 1933.

Bolin became the administrator of the estate of Armstead Ray August 7, 1937, three days after the date of Ray's death. After qualifying as administrator of Ray's estate, Bolin collected the sum of $682.85 upon certain life insurance policies upon Ray's life which were payable to Ray's estate. Bolin also collected certain rents on the house and lot.

Ray died testate, his will having been written by Bolin. This will reads as follows:

"Fort Smith, Arkansas.

"February 13, 1935.

"Last Will and Testament of Armstead Ray.

"I am of sound mind and healthy in body, and make this will that as Lewis Bolin or his heirs has been so kind to me during my last declining years, that I want to will to him or his heirs my property of which I am living on, and whatever insurance money I have left after my funeral expenses are paid. My household goods go to Myrtle Caldwell.

his

"Armstead   x   Ray

mark

"Joseph Smith, Witness,

"Emma Burns, Witness."

There was a contest over the probate of this will which was appealed to the circuit court where the will was sustained.

"There was also offered in evidence a paper writing, prepared by Bolin, reading as follows:

"Contract and Agreement

"This agreement, made concluded this 1st day of December, A. D., 1930, between A. Ray, of the first and L. Bolin of the second part, witnesseth, that the party of the second part agrees to pay the party of the first part such sum of money as to guarantee his upkeep during the winter in food, clothing, fuel and party of the first part can supply his own wants during the spring, summer and fall.

"If the party of the second part comply with above contract and agreement then the party of the first part do agree that all his possessions are to go to the party of the second part this contract and agreement to run until death separates one or the other or carried out by the party of the second part heirs or cancelled by mutual consent of the parties concerned.

"Armstead Ray

"Witness: Joseph Smith."

This instrument was signed by Ray, but not by Bolin.

On December 5, 1928, Steve and Sophia Blackburn borrowed $500 from one Henry Kaufman, evidenced by ten notes to Kaufman's order, due, respectively, at intervals of six months, in each of which notes interest to date of maturity was included. Ray did not sign these notes, but joined in the execution of the mortgage.

This suit was begun by Roy White, and Louise, his wife, to foreclose this mortgage. When the fact was developed that Bolin had acquired this mortgage from Kaufman, intending to give it to Louise, his daughter, and Roy, her husband, Bolin was made a party plaintiff to the foreclosure suit.

Bolin's attitude in this case is not consistent; but his inconsistency does not divest his legal rights. Notwithstanding the fact that he had acquired the mortgage and had joined in the suit to foreclose it, he claimed title to the lot, both under the contract to support Ray and under Ray's will set out above.

An answer was filed, in which Mrs. Archer joined, which contained allegations to the following effect. Edward, the son and heir-at-law of Steve and Sophia Blackburn, sold and conveyed the lot to Marie Isaacs on January 12, 1938, who later mortgaged it to Mrs. Archer, to secure a loan of $500. It was denied that Bolin had paid value for the Kaufman mortgage, and it was alleged that the debt which it secured was barred by the statute of limitations. By way of cross-complaint it was alleged that, if Bolin had paid anything for the Kaufman mortgage, he had been reimbursed by rents collected and the proceeds of the insurance policies.

The testimony was devoted largely to the matter of accounting, and the state of the accounts and the priority of the mortgages appear to be the real and controlling questions for decision.

The court found that the Kaufman mortgage had been assigned by Kaufman to Bolin, who had made payments thereon amounting to $489, and this mortgage was held to be superior and prior to the Archer mortgage.

The court further found that Bolin had collected insurance on Ray's life amounting to $682.85, which he claimed was disbursed as shown by his accounts as administrator filed in the probate court.

A decree was rendered ordering the foreclosure of the Kaufman mortgage, after ascertaining and declaring the balance which it secured as a prior lien; and Edward Blackburn and Mrs. Archer have appealed, and Roy and Louise White and Bolin have perfected a cross-appeal.

The deed from Ray to Blackburn vested the title in Blackburn. Had this deed been made upon the sole consideration of the agreement to support, it might have been rescinded upon failure of that consideration. The law of this subject was reviewed and restated in the case of *Goodwin* v. *Tyson,* 167 Ark. 396, 268 S. W. 15, and will not be here repeated. But the agreement to support was not the sole consideration for the deed. It was only a part of the consideration. Just what part does not appear.

At § 130 of the chapter on Contracts in 17 C. J. S., p. 477, it is said: "When there is a failure of a part of a lawful consideration, the part which failed is simply a nullity and imparts no taint to the residue. In such a case, as no particular amount of consideration is required, the promise may be enforced. In other words, if there is a substantial consideration left, it will still be sufficient to sustain the contract." At § 420 of the same chapter it is further said: "An unsubstantial failure of consideration is no ground for rescission, but only the basis for recovery of damages, and so a contract cannot be set aside for a partial failure of consideration not affecting the entire contract." See, also, *Ensign* v. *Coffelt,* 102 Ark. 568, 145 S. W. 232.

The agreement to support was only a part of the consideration, and Edward Blackburn insists that there was no failure of this part of the consideration, and that support and subsistence was in fact furnished by Steve, his father, in his lifetime, and by himself after Steve's death; and it is certain that some contributions on this

account were made. Ray took no action in his lifetime to rescind the deed, and no person of his blood now asks that relief.

In the case of *Jeffery* v. *Patton,* 182 Ark. 449, 31 S. W. 2d 738, it was said: ''The conveyances were not voluntary conveyances without consideration, nor was there any attempt to set them aside as in fraud of creditors. If the consideration for the deeds was an undertaking on the part of the grantees to support and maintain the grantor, their father, for the remainder of his life and there was a failure on their part to comply with the undertaking, the grantor himself could have sued at law for the amount of the consideration after it became due, or treated the contract as void and brought suit in equity to cancel and set it aside for failure of consideration. If the conveyances had been made on such conditions, he or his heirs upon the condition broken could have set it aside. The grantor did not find it necessary, however, to convey the property upon condition and the right to cancel for failure of consideration because of maintenance not being furnished in accordance with the agreement, if there was such an agreement, was personal to him. *Priest* v. *Murphy,* 103 Ark. 464, 149 S. W. 98.''

As to the contract and will, hereinbefore set out, it may be said.

First, as to the contract: It was signed only by Ray, and not by Bolin, and as Bolin assumed no obligation, he could impose none on Ray. If both were not bound, neither was; and as Bolin did not obligate himself, he will not be heard to say that Ray became obligated. Moreover, the contract, by its terms, was upon the express condition that Bolin comply with the contract and agreement to support Ray, in which event it was agreed that all Ray's possessions were to go to Bolin, and it was not shown that Bolin had complied with the conditions essential to vest title.

As to the will: It may be said that if Ray had previously conveyed the lot by deed, he could not subsequently devise it by will to another. But in any event

it will be remembered that Kaufman took the precaution to have Ray join in the execution of the mortgage to him; and while Ray did not borrow this money he had the right to mortgage his property to secure its repayment and this he did.

We conclude, therefore, that the court below was correct in holding that Kaufman's mortgage was a valid and subsisting lien on the lot, and was prior to the Archer mortgage. This holding disposes of the questions raised on the cross-appeal.

In the matter of accounting, the testimony took a wide range, and is very confusing. In his final settlement as administrator of Ray's estate, Bolin purported to account for the assets which had come into his hands except the lot. But this settlement does not appear to have been acted upon or to have been approved by the probate court. The only item with which Bolin charged himself as administrator was the insurance money, against which he claimed credit for the insurance premiums paid for many years by himself for Ray, and the expenses of Ray's last illness and for his funeral. These items exceed the insurance collected. The administrator's settlement recited that all the household goods had been delivered to Myrtle Caldwell, the devisee named in Ray's will. There is no question but that the major portion of the Kaufman debt was paid by Bolin. Kaufman testified that it was, and the court found the fact so to be. Upon this holding it was decreed that Bolin should be subrogated to the rights of the mortgagee. Later the mortgage was actually assigned to Bolin. It is unimportant to determine whether Bolin acquired the mortgage by subrogation or by its assignment to him; in either event he would be entitled to enforce the lien of the mortgage to the extent of the debt which it secured. To ascertain this sum was the purpose of the accounting, and the court found that sum to be $489. It would be interminable, and of small service, to discuss the various transactions between Bolin and Ray which led the court to this conclusion. We have carefully considered the testimony on these questions of fact, and are unable to

say that the findings of the court are contrary to the preponderance of the testimony.

The decree must, therefore, be affirmed both on the direct and the cross-appeal, and it is so ordered.